**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Miracle-Ear, Inc., et al.,** | ) | **CASE NO. 4:05 CV 1963** |
| | ) | |
| **Appellants,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **M.D. Consultants, Inc.,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Appellee.** | ) | |

**Introduction**

This matter is before the Court upon the Notice of Appeal filed by Miracle-Ear, Inc.,

Giannetto Giannetti and Sears Roebuck and Company from the Judgment and Order of the

Bankruptcy Court entered on August 1, 2005, and the Notice of Cross-Appeal of that decision

filed by M.D. Consultants, Inc.  For the following reasons, the Bankruptcy Court's Order is

affirmed in part and reversed in part.

**Facts**

Debtor plaintiff-appellee and cross-appellant, M.D. Consultants, Inc. (hereafter, MDC or

plaintiff) initiated an adversary proceeding in September 2002 in the Bankruptcy Court by filing

a Complaint against defendants-appellants Miracle-Ear, Inc. (hereafter, Miracle-Ear) Giannetto

Giannetti (hereafter, Giannetti) and Sears Roebuck and Company (hereafter, Sears) (collectively

hereafter, defendants).  An Amended Adversary Proceeding was filed in January 2003.  The

Bankruptcy Court held a trial and issued its findings of fact and conclusions of law on August 1,

2005.  Both parties have appealed that judgment and elected to have this Court hear the appeal.

The Amended Adversary Proceeding sets forth five counts.  Count One alleges breach of

contract.  Count Two alleges fraudulent transfer.  Count Three alleges fraud.  Count Four alleges

conversion/turnover.  Count Five alleges turnover.

The Bankruptcy Court's Memorandum Opinion (hereafter, Opinion) of August 1, 2005

states the following facts.

MDC was the franchisee of Miracle-Ear pursuant to three franchise agreements dated

September 28, 2000.  Pursuant to these franchise agreements, MDC operated retail

establishments that sold hearing aids in several locations throughout northeast Ohio and western

Pennsylvania.  Some of these stores were located in Sears stores and some were in "stand-alone"

facilities, located in Salem, Ohio and Poland, Ohio.

Michael Caparso was the vice-president of MDC and Frank Caparso was the president of

MDC.

As of May 2, 2002, MDC owed Miracle-Ear $637,261.21 on an account receivable, of

which $587,804.48 was past due.  Pursuant to a letter dated May 2, 2002, counsel for Miracle-

Ear gave notice to the Caparsos of MDC's breach of its obligations under the franchise

agreements.  The letter stated that, pursuant to the franchise agreements, the franchises would be

terminated unless MDC forwarded a certified check to Miracle-Ear within 30 days in the amount

2

of $469,942.34 and structured a payment schedule for the remainder of the balance due.  The letter additionally warned that failure to comply with these requirements by June 3, 2002 would result in immediate termination, without further notice, of the franchise agreements.

On June 3, 2002, Michael Caparso (hereafter, Caparso) met with representatives of Miracle-Ear at Miracle-Ear's headquarters in Minneapolis.  At the meeting, Caparso informed Giannetti (senior vice-president of Miracle-Ear's parent company) and Bob Wabler (chief financial officer of Miracle-Ear) that he could not make the required payment to Miracle-Ear. According to Caparso, Giannetti and Wabler left the room for approximately five minutes and returned to say that Miracle-Ear would have to take over the franchise.  Caparso testified that Wabler stated that Miracle-Ear would buy MDC's furniture and equipment, MDC would keep its accounts receivable, MDC could keep its two Ohio stand-alone stores (but it would have to remove the Miracle-Ear name) and Miracle-Ear would forgive the indebtedness owed by MDC. A subsequent fax, dated June 5, 2002 and sent by Caparso on June 7, 2002, to Giannetti memorializing these discussions was disputed in Miracle-Ear's June 8, 2002 faxed response. Caparso also testified that Wabler told him that he would not go away "empty handed."  Caparso understood that the value of what Wabler described was approximately $1 million, which Caparso believed was the approximate value of the MDC business.

Wabler and Giannetti then suggested that Caparso join them at dinner for further discussion. The dinner meeting was attended by Giannetti, Caparso and Brian Hugo, operations manager of Miracle-Ear.  Specific details of the transition of the franchise from MDC to Miracle-Ear were discussed.  Giannetti testified that the purpose of the meeting was to discuss MDC employees.  Key employees were discussed and Caparso testified that he was asked to try

3

to persuade these employees to stay on after the transition to Miracle-Ear in exchange for forgiveness of MDC's debt. Mitch Angelo was identified as a "top performer," and he and Dan Romeo were identified as being "at risk" of leaving instead of continuing their employment at their respective stores. Caparso also testified that it was his understanding that Miracle-Ear would continue to collect on the outstanding MDC accounts receivable and would remit such collected amounts to MDC.  In reliance on these understandings, Caparso contacted key employees and urged them to stay on with Miracle-Ear after termination of the franchise agreements.

The discussions at these two meetings were not reduced to a written agreement.

Giannetti and Holly Pichner (a Miracle-Ear employee) traveled to Youngstown, Ohio on June 4, 2002 to begin meeting with employees at the MDC stores.  Offers of employment were made to most MDC employees and eventually accepted.

Around June 7, 2002, Caparso sent Giannetti the fax dated June 5, 2002 setting forth his understanding of the June 3 conversations.  Giannetti responded by fax on June 8, 2002 indicating that Caparso's June 5 fax contained incorrect statements and that Miracle-Ear would reply to the June 5 fax as soon as possible.

A June 11, 2002 letter was sent by Miracle-Ear's attorney to the Caparsos in response to the June 5 fax.  This letter stated that the fax correctly stated that the franchise agreements were terminated effective June 3, but that all other provisions therein were incorrect except that Caparso was partially correct about Miracle-Ear's intention not to exercise its option to assume the two Ohio stand-alone stores.

Within the next few days, Caparso sent Miracle-Ear a list of the open accounts

4

receivable, as well as a list of the furniture and equipment that he anticipated Miracle-Ear was going to purchase.

A trial ensued before the Bankruptcy Court.  Following the two-day trial, the Bankruptcy Judge determined the following.

As to Count One, MDC failed to establish the requisite elements of an enforceable contract between MDC and Miracle-Ear and, therefore, there was no breach of contract based on the discussions at the June 3 meeting wherein Miracle-Ear allegedly agreed to purchase MDC's business for consideration consisting of MDC's retention of its accounts receivable, Miracle-Ear's purchase of the furniture and equipment, Miracle-Ear's forgiveness of MDC's debt and MDC's retention of the Ohio stand-alone stores.

As to Count Two, a fraudulent transfer did not occur based on Miracle-Ear's acquisition of MDC's business without paying MDC any consideration during a time when MDC was insolvent.

As to Count Three, subsequent to the termination of the franchise agreements at the afternoon meeting of June 3, 2002, Caparso was induced by Miracle-Ear to provide requested information about MDC's employees and to contact them to stay on with Miracle-Ear.  In consideration for Caparso's cooperation, Miracle-Ear promised to forgive MDC's debt to Miracle-Ear.  Miracle-Ear then disavowed any agreement to forgive the debt.  MDC, however, failed to put on evidence of monetary damages incurred as a result of its reliance on Miracle-Ear's representation and, therefore, no damages could be awarded on the fraud count.

Despite MDC's lack of evidence concerning its damages, Miracle-Ear clearly obtained a benefit as a result of its misrepresentation because it was able to employ MDC's top performing

employees and have a smooth and seamless transition.  As a consequence, Miracle-Ear's promise

to forgive MDC's debt in exchange for Caparso's efforts to help Miracle-Ear with a smooth

transition, and Caparso's performance, constitute an enforceable oral contract.  Although not

plead, the evidence at trial established the elements of a breach of contract regarding the

forgiveness of debt and the Bankruptcy Court conformed the pleadings to the evidence.

As to Counts Four and Five, Miracle-Ear owed MDC $49,093.43 in accounts receivable.

This matter is now before the Court upon the Notice of Appeal filed by defendants from

the August 1, 2005 Order and the Notice of Cross-Appeal of that decision filed by plaintiff.

**Issues on Appeal**

**a.  Issues presented by defendant-appellant**

1.  Whether the Bankruptcy Court committed reversible error in finding an oral contract
to forgive indebtedness.

2.  Whether the Bankruptcy Court  committed reversible error in determining that
Miracle-Ear owed plaintiff $89,676.28 arising out of the patient account receivables and
directing that the net amount of $49,093.43 be entered as judgment against Miracle-Ear.

**b.  Issues presented by plaintiff-appellee on cross-appeal**

1.  Whether the Bankruptcy Court erred in finding that MDC did not provide
compensatory damages arising from the fraud the Bankruptcy Court found to have been
committed by Miracle-Ear.

2.   Whether the Bankruptcy Court erred in not awarding MDC punitive damages for the
fraud committed by Miracle-Ear.

3.  Whether the Bankruptcy Court erred in not awarding MDC attorney fees and setting a
hearing on the amount of fees for the fraud committed by Miracle-Ear.

**Standard of Review**

Bankruptcy Rule 8013 sets forth the standard of review to be applied by district courts in

resolving bankruptcy appeals:

6

On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

"On the basis of this Rule, the Court must accept [the bankruptcy judge's] findings of fact unless they are found to be clearly erroneous." *In re G-P Plastics, Inc.,* 320 B.R. 861, 864 (E.D. Mich. 2005). "However, her conclusions of law are not entitled to the same deference and are subject to de novo review." *Id.* (citing *In re Batie*, 995 F.2d 85, 88 (6th Cir.1993)). *See also In re Wolf*, 331 B.R. 256, 260 (E.D. Mich. 2005) (citations omitted) ("The appropriate standard of review of the bankruptcy court's conclusions of law is de novo. In contrast, findings of fact entered by the bankruptcy court will not be set aside unless clearly erroneous, with due regard given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.")

**Discussion**

**a. Issues presented by defendant-appellant**

**1. Whether the Bankruptcy Court committed reversible error in finding an oral contract to forgive indebtedness**.

Defendants assert that the Bankruptcy Court erred in finding an oral contract to forgive indebtedness because the record does not support the existence or enforceability of such a contract. In this regard, defendants contend that the Bankruptcy Court's Opinion is inconsistent inasmuch as it rejected the existence of an oral contract as to Count One but conformed the pleadings to subsequently find the existence of one as to Count Three. For the following reasons, the Court finds that the Bankruptcy Court's finding of an oral contract on Count Three was sufficiently supported by the evidence.

Defendants point out that the Bankruptcy Court declined to find an oral contract as plead

in Count One.  Specifically, the Bankruptcy Court rejected plaintiff's contention that at the June 3 meeting, Miracle-Ear agreed to purchase MDC's business for consideration consisting of MDC's retention of its accounts receivable, Miracle-Ear's purchase of the furniture and equipment, Miracle-Ear's forgiveness of MDC's debt and MDC's retention of its Ohio stand-alone stores in Salem, Ohio and Poland, Ohio.  While the Bankruptcy Court rejected defendants' argument that the franchise agreements could not be modified in the absence of a writing signed by Miracle-Ear, the court determined that MDC failed to establish mutual assent- an essential element to the formation of an oral contract- because Miracle-Ear denied that an oral agreement existed.

Notwithstanding its finding that plaintiff failed to establish the elements of an oral contract as to Count One, the Bankruptcy Court found a separate agreement was reached at the second meeting at dinner on June 3.  This consisted of Miracle-Ear's promise to forgive MDC's debt to Miracle-Ear in exchange for Caparso's providing of information about MDC's employees to Miracle-Ear and contacting them to stay on with Miracle-Ear, thereby ensuring a smooth transition of the business.

The Bankruptcy Court stated that according to Miracle-Ear, termination of the franchise agreements was complete at the end of the June 3 afternoon meeting.  The court then proceeded to ponder the purpose of the dinner meeting- "Since termination of the franchise was complete, what was the purpose of the second meeting at dinner that same day?"  (Opinion at 12)  The court concluded that the purpose of this meeting was to discuss MDC's employees and have Caparso urge the key employees to stay on so that a smooth transition could be effected.  The court reasoned that the only incentive to Caparso was Miracle-Ear's promise to forgive MDC's

8

debt to Miracle-Ear.  The Court then concluded:

> Despite MDC's lack of evidence concerning its damages [on the fraud count], Miracle-Ear clearly obtained a benefit as a result of its misrepresentation because it was able to employ MDC's top performing employees and have a smooth and seamless transition. As a consequence, this Court finds that Miracle-Ear's promise to forgive MDC's debt in exchange for Caparso's efforts to help Miracle-Ear with a smooth transition, and Caparso's performance, constitute an enforceable oral contract.  The elements of a contract- an offer and acceptance (in this case, performance) have been established by MDC.  Even though MDC did not plead a cause of action for breach of contract regarding the forgiveness of debt in exchange for the smooth transition, the evidence at trial established these elements.  This Court will conform the pleadings to the evidence. Miracle-Ear made a promise to forgive the debt owed by MDC in exchange for Caparso's efforts to get MDC's key employees to work for Miracle-Ear.  MDC acted in reliance on this promise and performed the acts requested by Miracle-Ear.  Miracle-Ear benefitted from its promise, which induced performance by MDC.  Miracle-Ear evidently calculated that the benefit it would receive would be equivalent to the amount of debt that it promised to forgive.  As a consequence, this Court holds that, based on an oral contract, Miracle-Ear forgave the indebtedness owed by MDC under the Franchise Agreements.

(Opinion at 15-16).

The Bankruptcy Court reasoned that given that the franchise agreements were terminated by the conclusion of the afternoon June 3 meeting, the only purpose of having a second meeting over dinner that evening was to effect a smooth transition of the business.  In particular, the court noted, "Giannetti testified that he told Caparso that afternoon that Miracle-Ear was terminating the franchise and taking over the stores.  A reading of the franchise agreements and the May 3 letter support this assertion."  (Opinion at 12).  Defendants assert, however, that there is no factual basis in the record to show that the franchise agreements were terminated by the afternoon meeting.  Defendants point to Giannetti's trial testimony and contend that at no point did he testify that the termination of the franchise was complete at the close of the meeting. Defendants assert that Giannetti only testified that he was not going to rescind the May 2, 2002 termination letter:

9

> Q.  Did you at any time tell Mr. Caparso that the termination letter was going to be rescinded?
>
> A. Rescinded means not executed?
>
> Q.  Take it back?
>
> A.  No.

(Doc. 15 at 195).  While the trial transcript does not explicitly show that Giannetti testified that he told Caparso that afternoon that Miracle-Ear was terminating the franchise and taking over the stores, Giannetti did further testify:

> Q. ... Tell me about the dinner meeting that you had with Mr. Caparso.  Why did you go to dinner with him?
>
> A.  Well, I think that it was important.  I think at the time it was agreed that Miracle-Ear was taking over the locations and obviously we were trying to have some sort of, if possible, amicable or transition especially to protect the employees and to protect the customers.
>
> Q.  So the purpose was to discuss the various employees that were working for M.D. Consultants?
>
> A.  Yes.

(*Id.* at 199).  Thus, the Bankruptcy Court could conclude, based on the record, that "according to Miracle-Ear, termination of the franchise agreements was complete at the end of the June 3 afternoon meeting."

The Bankruptcy Court stated, "After the dinner meeting, Caparso did, in fact, contact his employees and urge them to stay on.  Angelo and Romeo both testified to that effect."  (Opinion at 13)  This seems to be supported by the record.

Caparso testified,

> Q.  How long did this meeting last?

10

A.  The evening meeting?

Q.  Yes.

A.  A few hours.  Probably two and a half to three hours.

Q.  So what happened after the meeting?

A.  When we were done talking we- - he took me back to my hotel room and then I immediately started calling all the employees.

Q.  When you say all the employees, I mean who are you referring to?

A.  The fitters.  I actually called the fitters, only the fitters in each location.  I started calling them and telling them what the deal was.  Tried to rest assure there was not going to be any - - any big change to them.  That they needed to stay on and sign employment agreements.  That was one of the things that Giannetto had- - had discussed with me, that he would be flying in the next day and meeting with the employees and that they had to sign employment agreements with Miracle-Ear Corporate.  So I told the fitters that he would be coming in to meet with them, that they should sign the agreements, that it would only be helping me if they did.  And if they didn't, it would be harming me.

(Doc. 14 at 64-65).

Mitchell Angelo testified that Caparso called him from Minneapolis and told him he no longer worked for him but that he now worked for Miracle-Ear.  Further,

Q.  Okay.  Did [Caparso] ask anything of you with regard to the transition from [MDC] to Miracle-Ear Corporate?

A.  He asked that we conduct business as usual, help make the transmission- transition as soon- as smooth as possible.  Continue working and servicing and selling to make, like I said, everything as smooth as possible for the transition.

Q.  Okay.  To the best of you knowledge, did he ask you to stay an employee of Miracle-Ear?

A.  Yes.  Yes, he did.

***

Q.  Did Mr. Caparso ever indicate why it was important for the employees to stay on?

11

A.  Just to help make everything go as smooth as possible to help with the transition.

(Doc. 14 at 141-142).  Angelo did not testify as to what time of day this conversation occurred.

Daniel Romeo testified,

Q.  Okay.  I'll again ask the question Mr. Romeo.  What was your understanding of the importance of you keeping your employment with Miracle-Ear Corporate?

A.  Mr. Caparso said everything was good.  We all had jobs and it was important for us to stay on.

Q.  Was it important because that was part of the deal?

A.  Right.

(*Id.* at 131).  Further,

Q.  Okay.  At whose request did you maintain your employment with Miracle-Ear after the transition?

A.  Well, obviously, I needed a job, but Mr. Caparso asked me to stay on.

(*Id.* at 135).

As noted by the Bankruptcy Court, "a smooth transition would inure to the benefit of Miracle-Ear, not MDC."  (Opinion at 13).  It only makes sense that Caparso would receive something in return- otherwise he had no incentive to aid Miracle-Ear in the transition.

Defendants, however, point to the testimony of Romeo and another employee, Gary Hudoba, which appear to show that Caparso solicited the employees *prior* to the dinner meeting.  Defendants assert, "It defies logic that conduct can be bargained for when it is performed prior to any discussion of the bargain being had!"  (Doc. 20 at 8).

Romeo testified that his conversation with Caparso occurred prior to the dinner meeting:

Q. ... And what, if anything, did Mr. Caparso tell you about those meetings?

A.  Well, he told me that he was, you know, going to lose the franchise and he was going

12

to dinner with someone up there and it was imperative that, you know, this was bad news for me to tell everybody.  That, you know, not to quit. Stay on.  He was going to have a dinner meeting later.

(Doc. 14 at 128).  And, defendants point to the deposition testimony of Gary Hudoba, which was introduced into evidence at trial:

And he said, well, I want you to stay because I've got an arrangement worked out where they are going to, basically, when they take over they are going to give me the collectibles that I have coming, or whatever, from whatever is outstanding, what we haven't collected yet...

And he said, 'You stay there.  I want everybody else to stay there, work with them.  And, you know collect whatever you can, because I'm going to be receiving that.'

And then he talked about they were- he was going out to dinner with Mr. Giannetti.

(Hudoba depo. 19-20).

Despite this testimony, the Bankruptcy Court determined that Caparso's testimony regarding his help with employees in exchange for the debt forgiveness was more credible than Miracle-Ear's witnesses, Giannetti and Wabler.  These were the principal actors and participants of the meetings.

As stated earlier, Caparso testified that he called the employees after the dinner meeting. Further, while defendants assert that Caparso nowhere testified that there was a "quid pro quo" involving forgiveness of the debt and his cooperation in the transitioning of employees, on cross-examination, Caparso testified,

Q.  Mr. Caparso, what did M.D.Consultants have then to offer to Miracle-Ear in exchange for forgiveness of the debt as you've alleged this morning?

A.  The way it was explained to me in that meeting and kind of reiterated that evening at dinner was the smooth transition and keeping the biggest asset of the company, the employees.

(Doc. 14 at 109).

13

Giannetti testified that there was no proposal that the debt be forgiven in exchange for Caparso's cooperation in transitioning the franchise stores to corporate stores.  (Doc. 15 at 195). Wabler also testified that there was no plan involving forgiveness of debt for Caparso's cooperation in the transition.  (*Id.* at 183).

Nonetheless, the Bankruptcy Court found Caparso's testimony more credible.  It additionally acknowledged Giannetti's testimony as to the importance of keeping key employees and a smooth transition.  (*Id.* at 199-200).

Defendants point out that Caparso's June 5 letter to Giannetti states, "Miracle-Ear, Inc., as of Monday evening (June 3, 2002) terminated the franchise agreement between MD Consultants, Frank and Michael Caparso and Miracle-Ear Incorporated."  (Jt. Ex. 5)  And, Caparso stated therein entitlement to purchase agreements dated prior to June 4, 2002. Defendants also point out that no mention is made in this letter of any agreement by Caparso to assist in transitioning employees of his franchise to Miracle-Ear corporate.  And, when asked at trial whether there was anything involved in the alleged agreement but not incorporated in the June 5 letter, Carparso declined to add anything.  (Doc. 14 at 119).  Thus, defendants assert, Caparso's attempt to document the supposed deal in his June 5 letter, is silent as to a separate contract relating to his assistance in the transition in exchange for forgiveness of debt.

Again, however, the Bankruptcy Court believed Caparso's testimony at trial that Miracle-Ear made the promise to forgive the debt in exchange for Caparso's promise to aid the transition. Also, upon consideration of the evidence, the court concluded that Caparso had no incentive to gratitously assist Miracle-Ear after it had terminated the franchises.

Defendants further point to the May 2, 2002 termination letter which was the 30 day

notice described in the franchise agreements.  Defendants note that the franchise agreements state that notices sent by certified mail shall be deemed to have been given two days after the date of mailing.  Thus, because the May 2 letter was sent by certified mail, it was deemed to have been given on May 4, 2002.  As a termination notice under the franchise agreements, the effect of the letter is that the agreements shall terminate without further notice to the franchisee effective immediately upon the expiration of 30 days- or June 4, 2002.  This, defendants assert, belies the finding that the franchise agreements were terminated at the conclusion of the June 3 afternoon meeting.  Defendants also point to the parties' stipulation herein that "on or about June 4, 2002 Miracle-Ear assumed control over the locations operated by [MDC] other than the locations known as Poland and Salem [the stand-alone stores]."  This, defendants assert, demonstrates that the termination was not effective until the end of June 3.  Such technical arguments cannot supercede the finding made by the Bankruptcy Court based on trial testimony that the parties agreed at the afternoon June 3 meeting to terminate the franchises.

Defendants additionally point to Caparso's testimony regarding what transpired at the June 3 afternoon meeting:

Q.  What happened then?

A. They came back in the room and they said, Mike, it looks like, you know, that we're going to have to take over the franchise and we started discussing different terms.

Q.  And who spoke about the terms of the takeover first?

A.  Mr. Wabler, at first, and asked me about- - he started asking me specific questions about what debt we had out and the furniture and equipment and the locations and our accounts receivable and said that we would be able to keep the accounts receivable, that they would probably purchase the furniture and equipment from the - - from us for the stores, and that they would forgive us- - forgive the debt that Frank and I owe and allow us to keep the Salem store, but we had to take the name Miracle-Ear off of it and not represent it as a Miracle-Ear office.  And that was it.

15

(Doc. 14 at 58).  Defendants point out that Caparso testified that with regard to the dinner

meeting, no changes were made to the terms of the agreement reached earlier in the day.  (*Id.* at

63).  Notwithstanding, Caparso did testify that at the dinner meeting

> Mr. Giannetti said Mike, we have to - - if we have a massive, you know, defection of
> your employees, then obviously we're not going to stand by this agreement.  We can't
> take over these stores and have everybody quit.  They're going to be non-operational.  So
> the employees are a very important part of the deal and we need you to secure these
> employees, so we need you to contact them and make sure they stay on.  And then he
> specifically mentioned a few of the names after I had given them background on each
> person, and said, you know, it's very important that these individuals stay on.  If they
> leave, then we're not going to - - we're not going to be able to honor the agreement that
> we made.

(*Id.* 62-63).  The Bankruptcy Court found Carparso's testimony to be credible and obviously

gleaned from this evidence that an agreement had been reached.  While defendants assert that

their June 11, 2002 letter to Caparso specifically denies that any agreement had been reached to

forgive any portion of the indebtedness of MDC, the Bankruptcy Court merely pointed to this as

evidence that it disavowed its agreement after it obtained the help it required of plaintiff.

Finally, defendants argue that although it was in their interest to have an amicable

transition and Giannetti acknowledged as much, Miracle-Ear has never offered compensation to

terminated franchises in exchange for assistance in recruiting employees.  Defendants assert that

Caparso's efforts in recruiting the former employees did not constitute legal consideration

because it was merely gratuitous, and not bargained for.  And, the employees' testimony does

not corroborate Caparso's motives in encouraging them to stay on.

The Bankruptcy Court, however, satisfactorily discussed consideration and found it to be

present[1]:

> Caparso had no incentive to help Miracle-Ear with a smooth transition of the business if he had not expected something in return.  If, as Miracle-Ear contends, the franchise agreements were terminated as of the afternoon of June 3 and Miracle-Ear was to keep the accounts receivable and still hold MDC liable for the entire amount of the unpaid debt, it is doubtful that Caparso would have wanted to socialize with Giannetti and Wabler at dinner that night - let alone expend time and energy to help with a smooth transition.

> When asked what MDC had to offer in return for forgiveness of the debt, Caparso testified that he could offer a smooth transition and continuation of employment by the current employees.  Although it is true that Miracle-Ear was not constrained in trying to hire the formed MDC employees and that it did not need Caparso's permission to recruit such employees, it did need MDC's help in identifying the key employees and top performers.  Furthermore, it likely would have been a benefit to Miracle-Ear if Caparso, someone known to those employees, contacted them first and paved the way for Miracle-Ear's employment overtures.

> Subsequent to termination of the franchise agreements, Caparso had no reason to help Miracle-Ear and yet he could provide unique information and assistance to Miracle-Ear regarding employees.  Caparso's testimony is credible that he was induced by Miracle-Ear to provide the requested information about MDC's employees and contact them to stay on with Miracle-Ear.  It appears that Carpaso was offered some consideration for his cooperation; the only evidence of what that consideration was comes from Caparso himself.  Since Miracle-Ear had no right to retain any of the accounts receivable ... and since it was obligated to purchase the furniture and equipment if it desired to keep the same, the only additional consideration for Caparso's cooperation was the promise to forgive MDC's debt to Miracle-Ear.  Miracle-Ear contends that it made no promise or representation to Caparso and/or MDC.  This Court finds that Caparso's testimony is credible and the testimony of Miracle-Ear's witnesses is not credible regarding the request for Caparso's help in identifying and retaining key employees.

(Opinion 14-15).

The findings of fact entered by the Bankruptcy Court will not be set aside unless clearly erroneous and due regard is given to the opportunity of that court to judge the credibility of the witnesses.  For the foregoing reasons, the Bankruptcy Court's findings are supported and this

---

[1]    Defendants had argued lack of consideration in their post-trial brief submitted to the Bankruptcy Court.

17

Court does not find reversible error in the finding of an oral contract in Count Three.

**2.  Whether the Bankruptcy Court  committed reversible error in determining that Miracle-Ear owed plaintiff $89,676.28 arising out of the patient account receivables and directing that the net amount of $49,093.43 be entered as judgment against Miracle-Ear.**

The Bankruptcy Court addressed Counts Four and Five of the Amended Adversary Proceeding together.  Count Four, entitled Conversion/Turnover, alleges that Miracle-Ear retained and collected plaintiff's accounts receivable in the amount of $212,077.12 and plaintiff's furniture, fixtures and equipment having a value of $120,620.92, and has refused to turn over the same.  Plaintiff alleges that it is entitled to a turnover of the money collected by Miracle-Ear pursuant to 11 U.S.C. § 542(a).  Count Five alleges that if Miracle-Ear has not retained and collected the accounts receivable, then New Party Defendant Sears has possession of the accounts and plaintiff is entitled to a turnover.  Prior to trial, the parties resolved the issue of the furniture and equipment and, therefore, only the issue of the accounts receivable remains.

Prior to commencement of the bankruptcy trial, the parties entered into Agreed Stipulations of Fact as to Customer Witnesses (sometimes referred to hereafter as "the Stipulation") setting forth their agreement concerning categories of accounts receivable.  The Bankruptcy Court imputed to Miracle-Ear receipt of all amounts set forth in the Stipulation (totaling over $89,000.00).  The court reached this conclusion for several reasons.

First, the Bankruptcy Court determined that because the franchise agreements were silent as to accounts receivable at the termination of the agreements, it must be inferred that the accounts receivable, which relate to sales made by MDC prior to termination of the agreements, are the property of MDC.  Miracle-Ear did not have a contractual right to refuse to turn over these amounts collected.

18

Second, the Bankruptcy Court pointed to testimony showing that following termination of the franchise agreements, Miracle-Ear did not take any action to segregate or otherwise account for collection on MDC's accounts receivable.

Third, the Bankruptcy Court clearly considered Miracle-Ear's conduct to be lackadaisical with regard to the accounts receivable. The court noted that testimony showed that Miracle-Ear did not attempt to look for any amounts received on MDC's accounts until more than a year after the adversary proceeding was commenced.  Moreover, the court found Miracle-Ear's conduct regarding the accounting for collection of the accounts receivable to be "inconsistent and unbelievable."  (Opinion at 18).  In particular, the court pointed out that prior to institution of the adversary proceeding Miracle-Ear believed it had a right of set off as to the accounts (although there was no legal right to set off under the agreements or the Bankruptcy Code) but then insisted for a significant period of time that it had collected no amounts on the accounts receivable.  Almost 1 ½ years after the commencement of the adversary proceeding, Miracle-Ear conceded that it had collected $37,582.85 on MDC's accounts receivable.   Shortly thereafter, it informed MDC that it located other payments constituting accounts receivable.  Further, the Bankruptcy Court noted that at the end of trial, Miracle-Ear stated that even though it had turned over all of the monies collected on MDC's accounts receivable, it would look into whether it had received payment on a particular account and, if so, would turn it over.  The court found this statement to be "inconsistent with an assurance that collection of all MDC accounts receivable have been accounted for."  (Opinion at 20).

Fourth, the court noted that Miracle-Ear did not produce information in response to MDC's request that it identify the accounts that Miracle-Ear had collected so that MDC could

19

proceed with collection actions on other accounts.  Miracle-Ear's failure to do so prohibited MDC from taking any effective action to collect on open accounts.

The Bankruptcy Court then concluded, "Under the circumstances, Miracle-Ear is the only party that can know if it collected any amounts on the MDC accounts receivable." (*Id.*)  As such, the court held that Miracle-Ear owed MDC $89,676.28, representing the sum of categories on the Agreed Stipulations of Fact as to Customer Witnesses, less $40,582.85 that Miracle-Ear paid to Sky Bank.[2]  Thus, the court found that Miracle-Ear owed a net amount of $49,093.43 to plaintiff.

Defendants assert that the court committed reversible error.  For the following reasons, this Court agrees that the judgment must be reversed in part.

Initially, this Court concludes that the Bankruptcy Court's finding that Miracle-Ear owes plaintiff $89,676.28 (less the amount tendered by Miracle-Ear to Sky Bank for a net amount of $49,093.43) is unsupported by the record.  At the close of trial, plaintiff's attorney stated, "... I have done a calculation redacting out the payments that my client on the stand admitted this morning as receiving, there are approximately $77,185.68 in unexplained lost receivables.  We believe, basically, that [defendants] got them.  That they took them and they're not telling the truth about it."  (Doc. 14 at 153).  In its post-trial brief, plaintiff calculates that defendants owe a sum total of $77,685.68, which includes the amounts subtracted based on testimony at trial that certain amounts were received by plaintiff.  (plaintiff's post-trial brief at 10-11). The Bankruptcy

---

[2]    Pursuant to a May 28, 2004 stipulation, approved by the Bankruptcy Court, Miracle-Ear turned over accounts collected by it, owned by MDC, in the amount of $40,582.85, to Sky Bank subject to a security interest held by the latter in the accounts of MDC.

Court appears to have ignored this information.  Accordingly, the gross amount of $89,676.28 is unsupported by the record.

Additionally, defendants informed the Bankruptcy Court in their post-trial brief that based on testimony presented by plaintiffs at trial, a particular payment in the amount of $1,350.00 was discovered and tendered to plaintiff.  (defendants' post-trial brief at 17). This also appears to have been ignored by the Bankruptcy Court.  Using plaintiff's figure in its post-trial brief, this payment results in the gross amount of $76,335.68, less the amount tendered by Miracle-Ear to Sky Bank for a net amount of $35,752.83 (and not $49,093.43).

The Agreed Stipulations of Fact as to Customer Witnesses consist of four categories of customer accounts. To justify turnover, plaintiff has the burden of proving, by a preponderance of the evidence, that Miracle-Ear had actual or constructive possession of the amounts therein. *In re De Berry*, 59 B.R. 891, 895 (E.D.N.Y. 1986).  *In re Burkholder*, 177 B.R. 260, 262 (N.D. Ohio 1995).

Defendants assert that because Miracle-Ear states that it did not receive the payments, plaintiff has failed to prove by a preponderance of the evidence that Miracle-Ear was ever in possession of the funds. As to all categories of the Stipulation, plaintiff asserts:

> The direct evidence that Miracle-Ear collected the accounts was the stipulated testimony from the customers that they had paid the amount owed, the testimony of Mr. Caparso that the account was open and owed at the time that Miracle-Ear took over MDC's operations, and the testimony of Miracle-Ear's managers that the accounts were collected in the ordinary way and paid to Miracle-Ear.

(Doc. 19 at 27, Doc. 22 at 5).

As to the Stipulation's first category (totaling approximately $4,500.00), the parties stipulate as to persons who if called to testify "would testify that they paid the amount identified

... but have no documents supporting such payments."

As to the second category (totaling approximately $23,000.00), the parties stipulate as to persons who if called to testify "would testify that they paid the amount identified... but Miracle-Ear states that such payments were made directly to plaintiff by third party payers such as insurance and Miracle-Ear has no record of receiving such funds."

As to this category, defendants point to Carparso's trial testimony wherein he stated that he received certain amounts.  (Doc. 14 at 78-79).  These amounts, however, were subtracted by plaintiff from the total amount of the Stipulation at the close of trial.[3]

As to the third category (totaling approximately $13,000.00), the parties stipulate as to individuals who if called to testify "would testify that they paid the amount identified ... but Miracle-Ear states that such payments were made directly to plaintiff through locations not controlled by Miracle-Ear, were made to plaintiff before the take over by Miracle-Ear, or were to [sic] Miracle-Ear on contracts with Miracle-Ear entered into after the filing of this bankruptcy case."

Defendants point to Michael Wallet's deposition testimony that one of the accounts identified (in the amount of $5,040.00) was not the property of plaintiff because the customer had canceled his contract and entered into a new one with Miracle-Ear Corporate. Plaintiff does not specifically counter this testimony.  Therefore, the evidence shows that this amount properly

---

[3]     Caparso also testified that an insurance company told him that one account in the amount of $7,300.00 had been paid to Miracle-Ear.  (Doc. 14 at 78-79) The Court agrees with defendants that this is hearsay testimony and, therefore, will not consider it. Furthermore, whether the testimony was introduced would not have altered the Bankruptcy Court's determination that plaintiff proved that Miracle-Ear was paid the amounts in this category.

belonged to defendants. Defendants also point to Caparso's testimony that a partial payment was made to plaintiff on another account. This amount, however, was subtracted by plaintiff from the total amount of the Stipulation at the close of trial.

Defendants argue that plaintiff has not produced evidence that the accounts receivable were received by defendants and, therefore, in the absence of evidence showing that the receivables were collected and withheld by defendants, the Bankruptcy Court could not enter judgment on this claim against them. The Bankruptcy Court concluded, however, that defendants had possession of the accounts based on defendants' testimony at trial with regard to Miracle-Ear's handling of the accounts receivable and defendants' pre-trial conduct involving these accounts, as well as plaintiff's testimony that the accounts were open at the time Miracle-Ear took over MDC's operations. The Bankruptcy Court also recognized the Stipulation wherein the parties agreed that the customers paid the amount of the accounts identified in the first three categories and disbelieved Miracle-Ear's defense as to those amounts set forth in these categories. This finding is supported by the evidence and will not be reversed except for the account in the amount of $5,040.00 in the third category.

The fourth category (totaling approximately $49,000.00), however, represents accounts of individuals served with subpoenas by plaintiff but plaintiff received no response and Miracle-Ear states that it has no record of payment.

Defendants assert that as to these accounts there is no evidence that anyone ever got paid and Miracle-Ear denies receipt of payment. Moreover, defendants contend that plaintiff never followed up with the unanswered subpoenas and, therefore, there is no evidence to conclude that Miracle-Ear received payment on these accounts.

23

Unlike the first three categories, as to this fourth category, the parties did not stipulate that the customers paid any amounts.  Rather, these individuals were identified as being sent subpoenas to which they did not respond.  While the Bankruptcy Court could conclude as to the first three categories that defendants' conduct with regard to handling of the accounts receivable together with the Stipulation's agreement that the customers paid on the accounts resulted in a determination that defendants had possession of the accounts, there is insufficient evidence to support such a finding that defendants are in possession of the amounts identified in the fourth category.

For these reasons, the Bankruptcy Court's finding as to Counts Four and Five is reversed in part.  The Bankruptcy Court's finding that defendants owe MDC the gross amount of $89,676.28 on accounts receivable is reversed to the extent that the gross amount equals $76,335.68 (representing the sum of the categories on the Stipulation, less the amounts redacted as discussed above).   This amount is further diminished by $5,040.00 (from category three) and $49,453.45 (from category four), for a total of $21,842.23.  This amount is then offset by the portion of the $40,582.85 paid to Sky Bank by Miracle-Ear.  The Court is unaware which portions of the Stipulation were paid to Sky Bank.

**b.  Issues presented by plaintiff-appellee on cross-appeal**

**1.  Whether the Bankruptcy Court erred in finding that MDC did not provide compensatory damages arising from the fraud the Bankruptcy Court found to have been committed by Miracle-Ear.**

**2.   Whether the Bankruptcy Court erred in not awarding MDC punitive damages for the fraud committed by Miracle-Ear.**

**3.  Whether the Bankruptcy Court erred in not awarding MDC attorney fees and setting a hearing on the amount of fees for the fraud committed by Miracle-Ear.**

These issues will be addressed jointly.  Plaintiff asserts that the Bankruptcy Court erred in not awarding actual damages, punitive damages and attorney's fees to plaintiff after determining that Miracle-Ear engaged in fraud.  For the following reasons, this Court disagrees.

Plaintiffs contend that the Bankruptcy Court correctly found that Miracle-Ear engaged in fraud but that its error was in holding that plaintiff did not show any damages from the reliance on Miracle-Ear's statements.  Plaintiff asserts, "MDC's damages are exactly the same as the damages from the breach of the agreement; to wit the release from liability, the collection of the accounts and the purchase of the furnishings and equipment."  (Doc. 19 at 25).  Defendants argue that the Bankruptcy Court did not find a cause of action for fraud.  This Court agrees.

Having found that plaintiff established a material fraudulent representation by defendants upon which plaintiff reasonably relied and suffered a detriment, the Bankruptcy Court concluded, "However, MDC put on no evidence of any monetary damages it incurred as a result of its reliance on Miracle-Ear's representation.  As a consequence, this Court is constrained to award any damages to MDC on the fraud count."  (Opinion at 15).  The court then conformed the claim for fraud into one for breach of oral contract and found that Miracle-Ear forgave the indebtedness owed by MDC.

Plaintiff further asserts that punitive damages and attorney's fees were warranted because there was overwhelming evidence that the fraud was malicious.  However, plaintiff has not demonstrated that the record supports a finding of malice.  As recognized by plaintiff, to recover punitive damages the plaintiff must show by clear and convincing evidence that defendants' actions amounted to malice, aggravated or egregious fraud.  *See Weber v. Obuch*, 2005 WL 3556693 (Ohio App. 9th  Dist. Dec. 30, 2005).  Plaintiff only points to defendant's alleged fraud

25

but does not demonstrate malice or egregiousness.

For these reasons, the Bankruptcy Court's decision regarding damages on the fraud count will be left undisturbed.

**Conclusion**

For the foregoing reasons, the Bankruptcy Court's decision is affirmed in all respects except for its finding concerning the accounts receivable.  With regard to the latter, the decision of the Bankruptcy Court is reversed to the extent that defendants owe plaintiff the gross amount of $21,842.23, less the amount tendered and paid to Sky Bank.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan_____
PATRICIA A. GAUGHAN
United States District Judge


Dated: 2/14/06